

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-14-00241-CR

JAWAUN DOMINIQUE NEELEY                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1302105D

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Jawaun Dominique Neeley pled guilty to aggravated assault with a deadly weapon as charged in the indictment,[2] and a jury assessed his

---

[1]*See* Tex. R. App. P. 47.4.

[2]The State charged Neeley with having intentionally, knowingly, or recklessly caused bodily injury to Mitchell Washington by shooting him with a firearm.

punishment at fourteen years' confinement and a $10,000 fine. *See* Tex. Penal Code Ann. § 22.02(a)(2), (b) (West 2011); *see also id.* § 12.33 (West 2011) (stating that second-degree felony sentencing range is two to twenty years' confinement and may include a fine not to exceed $10,000). In a single issue, Neeley complains that his sentence is grossly disproportionate to the offense in light of the facts and evidence presented at his punishment trial. We affirm.

## II. Discussion

### A. Presentment

Neeley did not object to his sentence in the trial court. Instead, he filed a motion for new trial containing his proportionality complaint. When, as here, an appellant does not object to his sentence when it is imposed, he must complain in a motion for new trial *and* present that motion to the trial court, or he fails to preserve the complaint for appellate review.[3] *Means v. State*, 347 S.W.3d 873, 874 (Tex. App.—Fort Worth 2011, no pet.); *Laboriel-Guity v. State*, 336 S.W.3d

---

[3]Generally, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013); *Sanchez v. State*, 418 S.W.3d 302, 306 (Tex. App.—Fort Worth 2013, pet. ref'd). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt*, 407 S.W.3d at 263. A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

754, 756 (Tex. App.—Fort Worth 2011, pet. ref'd); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd).

Rule of appellate procedure 21.6, "Time to Present," generally requires a defendant to "present" a motion for new trial to the trial court "within 10 days of filing it." Tex. R. App. P. 21.6. The presentment requirement means that "[t]he defendant must put the trial judge on actual notice that he desires the judge to take some action, such as making a ruling or holding a hearing, on his motion for new trial." *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009), *cert. denied*, 562 U.S. 850 (2010). Presentment must be apparent from the record and "may be shown by such proof as the judge's signature or notation on the motion or proposed order, or an entry on the docket sheet showing presentment or setting a hearing date." *Id.* The defendant bears the burden of ensuring this notation or setting a hearing. *Burrus v. State*, 266 S.W.3d 107, 115 (Tex. App.—Fort Worth 2008, no pet.). A statement in a motion for new trial entitled, "certificate of presentment," with a notation on the trial court's docket sheet stating that the motion for new trial was filed, is insufficient to establish presentment under rule 26.1. *Id.* Likewise, a "certificate of presentment" that states that a copy of the motion would be hand-delivered to the trial court is insufficient to show that presentment actually occurred without additional documentary evidence or a notation that the trial judge personally received a copy of it. *Gardner*, 306 S.W.3d at 305.

3

Here, a handwritten notation on the trial court's docket sheet dated June 16, 2014 states: "Motion for New Trial; cc: State," but the motion itself does not contain a signature or initials by the trial judge. The motion for new trial did include a proposed order to set the motion for a hearing, but that order was not completed, nor does the docket sheet reflect that a hearing was set or held on the motion.[4] *See Burrus*, 266 S.W.3d at 115 (holding no presentment when the record showed no ruling on the motion, no proposed order containing the judge's signature or notation, and no notation on the docket sheet of a hearing date set on the motion); *Hernandez v. State*, 84 S.W.3d 26, 31–32 (Tex. App.—Texarkana 2002, pet. ref'd) (holding no presentment when docket sheet showed only the filing of the motion and record did not reflect actual notice to the trial court); *see also Richardson v. State*, 328 S.W.3d 61, 72 (Tex. App.—Fort Worth 2010, pet. ref'd) (holding that disproportionate-sentence complaint was not preserved when record showed no presentment in the form of an entry on the trial court's docket sheet regarding the motion, no hearing set or held, no signature by the judge on the motion, and no indication that the trial court had actual knowledge that the motion for new trial had been filed); *cf. Lawrence v. State*, 420 S.W.3d 329, 333 (Tex. App.—Fort Worth 2014, pet. ref'd) (concluding that appellant preserved his excessive sentence complaint when his pro se

---

[4]Although Neeley's counsel asserts in his appellate brief that he delivered a file-stamped copy of the motion to the drop box located in the trial court coordinator's office, we may not consider factual assertions that are outside the record. *See Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004).

4

motion for new trial contained a handwritten notation with the trial judge's initials and the docket sheet contained a stamped entry stating that the motion for new trial was filed and sent to the State and court of appeals). We hold that under these circumstances, Neeley has not complied with rule 21.6's presentment requirement.

## B. Proportionality

Even if Neeley's complaint had been preserved, punishment assessed within the permitted statutory range is generally not subject to a challenge for excessiveness unless it is grossly disproportionate to the offense committed. *See Lawrence*, 420 S.W.3d at 333. To address a proportionality claim, we must first compare the gravity of the offense committed against the sentence's severity. *See Moore v. State*, 54 S.W.3d 529, 542 (Tex. App.—Fort Worth 2001, pet. ref'd) (citing *Solem v. Helm*, 463 U.S. 277, 291–92, 103 S. Ct. 3001, 3010 (1983); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir.), *cert. denied*, 506 U.S. 849 (1992)). Only if we determine that the sentence is grossly disproportionate to the offense do we need to consider whether the sentence is comparable to sentences imposed upon other criminals in the same or other jurisdictions. *Id.*

### 1. Evidence

Neeley, who was twenty-two years old at the time of the trial, shot his mother's long-term boyfriend Mitchell Washington in the back with a rifle after they argued on the morning of October 24, 2012. The jury saw the rifle and photos of Washington's gunshot wound, listened to a recording of the 911 call,

and heard about Neeley's background, including earlier interactions with Washington, previous incarcerations, the events of that morning, and his behavior while incarcerated awaiting trial.

### a. Neeley's Background

Neeley was first incarcerated in Indiana when he was approximately ten years old, and, other than a brief probation at age fourteen, he remained more-or-less incarcerated until he turned fifteen years old. Although most of his troubles appeared to involve anger management issues, Neeley testified at trial that he no longer had anger problems.

During his youth Neeley had also associated with a gang, Piru, in both Indiana and California, but he denied associating with any gang once he moved to Texas. His family moved to Texas in 2008, and in 2009, Washington moved into the family's home.

Neeley's mother and sister testified that after Neeley arrived in Texas, he dropped out of high school. While he started to take some GED courses, he never completed his GED. Instead, according to his mother, he just took jobs "here and there."

Neeley's twenty-year-old sister testified that from 2008 to October 2012, she had never known Neeley to have a job. Neeley testified that he earned money by selling marijuana in Indiana and then in Texas, and he could make $1,000 to $1,500 in two weeks in that endeavor. How much he sold depended on whether he had a bill to pay or needed something. Neeley said that he would

smoke some of the inventory, and then he might use half of the proceeds to pay a bill and the other half to buy clothes or other things he needed. He did earn money from other jobs he held from time to time as well, specifically as a worker for the City of Grand Prairie and as a salesman for Entrust Energy. During those periods of employment, Neeley testified, he did not have to sell drugs.[5]

Neeley stated that he started working for the City of Grand Prairie in 2009, stopped working for the city in 2010, and then went back to work for the city in 2011. Perhaps not coincidentally, these gaps in employment coincide with a period of criminal activity on Neeley's part. In 2010, Neeley was convicted for two class B misdemeanor terroristic-threat offenses, to which he pled guilty in exchange for sixty-five days' confinement, and in 2011, he pled guilty to a class A misdemeanor failure-to-identify offense in exchange for twenty-eight days' confinement.

Neeley's 2010 convictions arose from an incident involving a 2:01-a.m. bar fight called into the police first as a large disturbance involving multiple persons and then to report an individual with a firearm. Two witnesses at the scene identified Neeley to the police, and Neeley was charged with having threatened to murder them or commit an aggravated assault of them. Neeley testified that the fighting began when someone shoved him and he pushed back. After that individual spat on him, Neeley said that he tossed him into a car. Someone else

---

[5]Neely had been working for Entrust Energy, selling electricity door-to-door until he was arrested in this case.

7

punched Neeley, and before he started fighting, someone said, "Go get the gun out of the trunk." Neeley said that when he overheard this, he retrieved his own gun, which was not loaded and which did not work, and while he was fighting, the gun fell out of his pocket. Neeley said he then picked up the gun and pointed it when "homey rush [him]." When the man came forward, Neeley hit him with the gun.

Neeley was detained by officers who found a handgun (a .22 small caliber revolver) in his vehicle. Neeley told the police that the gun had fallen out of his pants when he was fighting and that he might have hit someone with the gun but did not mean to point it at anyone. He explained to the officers that the gun's pin was broken, preventing it from being loaded, and that he just used the gun to scare people.

Neeley's 2011 conviction also arose from an incident involving a fight with a possible gun that occurred after midnight. During the investigation after the police were called to the scene, a handgun and a .20 gauge shotgun were found in the vehicle Neeley identified as his. Neeley admitted that initially he gave the police a false name, but that two minutes later he gave them his correct name. He denied allegations that he told Derrick Williams, "We're going to get a gun and shoot you," and he also denied that he had participated in the fight in front of Williams's house.

While the 2010 terroristic-threat and 2011 failure-to-identify misdemeanor convictions may appear to be unrelated, isolated incidents, the jury could have

8

reasonably concluded that the convictions revealed a common theme—escalating early morning altercations that involve the use or threat of firearms.

### b. The Shooting

Like the 2010 and 2011 incidents, this case also shares an early-morning argument involving a firearm. According to Neeley, the events actually began a few days earlier after Washington wrote a threatening rap song about him and threatened to either kill Neeley or have someone else kill him. According to Neeley, Washington had been abusive to Neeley's mother in the past and had been violent with others as well. Neeley's mother also testified about Washington's abusive behavior, relating an occasion when Washington had become intoxicated, "smacked and poked [her] in the face," and used foul language.[6]

Neeley did not live with his mother and Washington. According to his sister, while he stayed at their house once or twice a week, he usually lived with his friend Dre. Neeley testified that he had been living in Oklahoma with his girlfriend.

On the day of the shooting, Neeley's sister let Neeley into the house around 4:00 a.m. A few hours later, Neeley and Washington quarreled after

---

[6]Neeley's mother testified that when Washington passed out on that occasion, he began having trouble breathing. Neeley told his mother to call 911 and held Washington while she performed CPR as instructed by the 911 operator. Neeley testified that he held Washington's head while his mother performed CPR because he "wasn't about to do all that."

Washington accused Neeley of staring at him. Neeley's mother tried to calm them, and when Neeley went outside to his vehicle, his mother followed.

Washington followed them outside and began threatening Neeley. During the encounter, Washington became aggressive,[7] using foul language and calling Neeley and his mother derogatory names.

Neeley decided to shoot Washington,[8] so he removed a rifle from his vehicle and fired the weapon at Washington, hitting him in the back from around ten feet away.[9] At the moment Neeley discharged the weapon, Neeley's sister was standing just out of arm's reach of Washington and their mother was in between Neeley and Washington, such that Neeley could have hit either of them instead of his intended target. After the shooting, Neeley put the rifle back into his vehicle, apologized to his brother, his sister, his mother, and Washington, and drove away.[10] His sister testified that there was blood everywhere after the shooting.

---

[7]Neeley's sister and mother both opined that Washington was an aggressive individual and that he had a reputation as such. Neeley's mother said that Neeley shot Washington in defense against Washington's verbal aggression.

[8]Neeley admitted at trial that he intended to shoot Washington, not just to scare him, when he got the rifle out of the vehicle.

[9]Neeley explained that he brought out the gun because he was worried about what Washington was going to do to him. Neeley's mother said that she was not surprised that there was a rifle in Neeley's vehicle because "everybody" knew that he had it.

[10]Neeley's mother said that Neeley paced back and forth and started crying before he left.

Neeley said he was on his way to the police station when a police officer pulled him over. Somewhere along the way, he removed the shell casing and threw it into a ditch. The police officer who stopped Neeley's vehicle testified that Neeley did not attempt to evade arrest and was cooperative. Neeley told the officer that he was the one they were looking for, that he shot Washington, and that the rifle was in the back seat. Neeley testified that he sincerely regretted his action and that he cried for two days after the incident.

Washington was in surgery for two and a half to three hours and remained in the hospital for almost two weeks. Washington's mother and her husband took care of him after he was discharged, packing his wounds twice a day for approximately a month, then once a day, depending on drainage, after that. According to Washington's mother, the bullet had "exploded his left kidney and took six inches of his large intestine." Washington's wounds took around seven months to heal, during which time he had to walk with a cane and required assistance with activities such as going to the bathroom. At the time of trial, Washington's mother testified that he continued to live with them and that his mobility had improved.

### c. Post Shooting Incarceration

Neeley was incarcerated continuously after his arrest, and the jury heard testimony from Tarrant County Corrections Center detention officers about his behavior during the eighteen-month period. Two female jailers testified about occasions when Neeley masturbated in front of them; another jailer testified

11

about a physical altercation that Neeley engaged in with another inmate in December 2012. According to the testimony, Neeley had been incarcerated for less than a month when a jailer put in a move-sheet request that Neeley be reclassified because his behavior was not suitable for general population.

Neeley admitted that the correctional officers were telling the truth about his masturbatory activities. Neeley also testified that, while he had not always followed the jail rules, he had never assaulted any of the correctional officers. During his confinement in jail, Neeley said that he had been written up for causing disturbances "[p]robably like four times," and that he had been written up for engaging in fights twice.

While he was in custody Neeley also got a dollar sign tattooed between his eyebrows. He said that he got the dollar-sign tattoo because he liked money and having nice things, so "[he] took the initiative to get it."

### 2. Analysis

Neeley was convicted of a second-degree felony. *See* Tex. Penal Code Ann. § 22.02(a)(2), (b). The punishment range for a second-degree felony is two to twenty years' confinement and may include a fine not to exceed $10,000. *See id.* § 12.33.

Neeley argues that his "extraordinarily difficult childhood,"[11] his age, and Washington's threats and violent nature, combined with his having pled guilty and his expression of continuing remorse, "should have been more heavily weighed by the jury in assessing his punishment." He further argues that the record "is fairly clear that [he] did not and does not have the financial wherewithal to pay any amount of fine, much less a $10,000 fine." And he contends that because he was probation-eligible, probation would have been more appropriate as a deterrent of future criminal activity.

What the record reveals is that Neeley has a history of anger problems that escalate into violent episodes, often involving the use or threats of use of guns. On this occasion, an argument between Neeley and Washington had steadily escalated, culminating in Neeley's removal of a rifle from his vehicle with the intent to shoot Washington. He did shoot Washington—in the back—destroying one of Washington's kidneys. And, just as he had witnessed his own uncle being shot by gang members, Neeley's younger brother, sister, and mother bore witness to his crime. Two of them stood within the range of fire as Neeley discharged the weapon.

Neeley had been incarcerated for much of his youth but, based on his later activities, the jury could have reasonably inferred that he had received no

___

[11]In addition to other difficulties he faced during his childhood, Neeley testified that when he was six years old, he witnessed his uncle being murdered by a Crip gang member.

13

rehabilitative benefit from the experience. Nor did the evidence tend to prove that these periods of incarceration deterred Neeley from engaging in criminal activity in his adult life. He dabbled in drug dealing whenever he needed money, and he had a documented history of carrying weapons and using them to threaten others. Based on the entire record, and in light of the punishment range, we cannot say that the jury's fourteen-year sentence and $10,000 fine[12] is grossly disproportionate to the offense. Therefore, we do not reach the question of comparable sentences. *See Moore*, 54 S.W.3d at 542. We overrule Neeley's sole issue.

## III. Conclusion

Having overruled Neeley's sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 30, 2015

---

[12]Neeley refers us to his failure to graduate high school and his lack of a long employment history to support his argument that the $10,000 fine is excessive but he directs us to no other evidence to show his ability or inability to pay a fine.